

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN WRIGHT            :        CIVIL ACTION
                       :
    v.                 :
                       :
FUNDAMENTAL LABOR STRATEGIES : No. 08-1647

MEMORANDUM

Dalzell, J.                                  March 10, 2009

  Plaintiff Alan Wright sued his former employer Fundamental Labor Strategies ("FLS"), formerly known as Labor and Logistics Management, Inc., for terminating his employment in violation of Title I of the Americans with Disabilities Act ("ADA"). The parties have filed cross-motions for summary judgment, which we resolve in FLS's favor.

I. **Factual Background**

  FLS provides various driving related services to its clients, including the leasing of drivers. Joint Stip. ¶¶ 1, 2. These leased drivers are full-time employees of FLS but are assigned for protracted periods to specific customers. Id. Drivers report directly to the customer's work site each day, but FLS pays the leased drivers' hourly wages and provides them with benefits. Id.

  FLS also has a FlexDriver Program, under which FLS acts

as a broker, and the drivers operate as independent contractors. Id. ¶ 3. Drivers in the FlexDriver Program call FLS each day to learn of work opportunities with FLS's customers. Id. When such opportunities exist, the drivers report to the customer's work site, render the driving services, and present timesheets reflecting hours worked. Id. The customer and driver then agree on the hours worked and submit those hours to FLS. Id. FLS invoices the customer and remits payment to the driver based on an agreed upon hourly rate. Id. Drivers in this program receive no benefits from FLS. Id. ¶ 14.

Pursuant to United States Department of Transportation ("DOT") regulations, commercial truck drivers -- including both types of FLS drivers -- must submit to periodic medical examinations and receive medical certifications. Id. ¶¶ 4, 19; 49 C.F.S. § 391.41. Generally, these certifications are valid for two years, but the regulations place restrictions on those with medical conditions, e.g., high blood pressure. Joint Stip. ¶¶ 19-20. Those diagnosed with, or medicated for, hypertension can only receive a one-year medical certification. Id. ¶ 20; 49 C.F.R. § 391.43.

FLS makes full-time employment contingent on drivers receiving a two-year medical certification from the DOT. Joint

Stip. Ex. E.  It is FLS policy not to maintain any full-time employees who do not have, or cannot get, the two-year medical certification.  Id. ¶ 33.  Since September 17, 2003, FLS has terminated seven drivers, including Wright, for failure to receive a two-year medical certification.  Id. ¶ 32.  FLS's stated reason for this policy is that it allows FLS "to offer clients drivers for longer time periods, with the highest medical clearances, and it is administratively easier for FLS."  Id. ¶ 10.  Drivers in the FlexDriver Program, however, are not obliged to have a two-year medical certification.  Id. ¶ 30.

    Alan Wright first became a full-time FLS driver on April 6, 2001.  Id. ¶ 6.  The employment contract he signed at the time stated that he must have a two-year medical certification from the DOT to be eligible for employment.  Id. Ex. B.  Wright worked on FLS's Toll Brothers account until December 14, 2001.  Id. ¶ 11, Ex. C.  On December 17, 2001, Wright signed an Owner/Operator Independent Contractor Agreement with FLS to participate in the FlexDriver Program and ceased being a full-time employee.  Id. ¶ 12, Ex. D.  Wright worked as an independent contractor from December 17, 2001 until April 29, 2002.  Id. ¶ 13.

    On May 1, 2002, Wright signed another employment

contract to become, once again, an FLS full-time employee. Id. at 15. This employment contract made Wright's employment contingent on receiving a two-year medical certification. Id. ¶ 16, Ex. E. FLS assigned Wright to its PetValue account. Id. On November 8, 2002, Wright signed another independent contractor agreement which allowed him to work extra hours through the FlexDriver Program, while retaining his full-time employment with FLS on the PetValue account. Id. ¶ 17, Ex. F at 84-86, Ex. G.

During Wright's March 9, 2007 medical certification exam, he disclosed that he was taking Micardis for his high blood pressure. The medical examiner, Dr. Gouri Atri of Concentra Medical Centers, measured Wright's blood pressure at 138/88. Id. ¶¶ 23-24, Ex. L. Despite Wright's admission about his high blood pressure medication, Dr. Atri qualified him for a two-year medical certification. Id. ¶ 24, Ex. L.

The following week, Jeff Muntz, an FLS Human Resources Manager responsible for DOT compliance, reviewed Wright's medical examination report, noted his disclosures, and contacted Concentra. Id. ¶ 25. On March 19, 2007, Muntz spoke with Dr. Atri about Wright's medical examination report. Id ¶ 26. Dr. Atri conceded that the two-year certification was issued in error, and Wright was only eligible for a one-year certification

4

because of his high blood pressure treatment. Id. ¶ 26, Ex. M. Wright was then issued a medical certificate that expired in one year. Id. ¶ 27, Ex. N.

On March 21, 2007, FLS removed Wright from his driving duties. Id. ¶ 28, Ex. O. On March 25 or 26, 2007, FLS terminated Wright as a full-time FLS driver. Id. Ex. F at 99, Ex. O. FLS's official reason for terminating Wright was that he "received a one year [medical] card when he went for recertification. He no longer meets our minimum hiring [criteria] for an employee." Id. Ex. O. On March 26, 2007, FLS offered Wright the opportunity to work in the FlexDriver Program. Id. ¶ 31, Ex. P. Wright declined to sign the waiver and release, so FLS did not take him on as a FlexDriver. Id. ¶ 31.

Wright filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 22, 2007. FLS Mem. Ex. D. He filed the current suit on April 7, 2008.

II. **Analysis**[1]

---

[1] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Whenever a

Wright sued FLS for violating the ADA under a disparate impact theory.[2] He alleged that FLS regarded him as being disabled because of his high blood pressure, and terminated him based on a policy that has a disproportionate impact on those who, like him, have high blood pressure.

---

factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Id. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982). It is not enough to discredit the moving party's evidence, the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See id. at 249-50. Also, if the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[2] Wright states that he is not asserting a disparate treatment claim. Wright Mem. at 6. Wright also alleged a breach of contract action in his complaint, but withdraws that claim now. Id. at 8.

A. <u>Whether Wright's EEOC Charge Covers Disparate Impact</u>

As an initial matter, FLS argues that Wright cannot raise his disparate impact claim here because he never raised it in the administrative process before the EEOC. FLS Mem. at 16. Courts have held that if a plaintiff does not raise a particular theory of discrimination during the administrative process he cannot use it to prove his claim in this Court. See <u>Crescenzo v. Hajoca Corp.</u>, 2008 WL 1815326 (E.D. Pa. April 22, 2008); <u>Wilson v. Philadelphia Housing Auth.</u>, 2008 WL 69901 (E.D. Pa. March 12, 2008). But Wright's administrative charge of discrimination states that

> Respondent's reason for [termination] was because the maintenance medication I am taking requires that I certify annually instead of every two years. Mr. Samsel further stated that since I do not qualify for the 2 year Medical Examiner's Certificate, I cannot continue to be employed as a permanent driver.

FLS's Mem. Ex. D. This charge squarely states that Wright takes issue with FLS's policy requiring a two-year medical certification for its full-time drivers, and therefore his disparate impact claim, which focuses on this policy, falls within the ambit of the charge.

B. <u>Whether FLS Regarded Wright as Disabled</u>

The ADA makes it illegal for employers to "discriminate

7

against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For a plaintiff to take advantage of the ADA's protections, he or she must be disabled under the statute, that is, suffer "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Deane v. Pocono Med. Ctr., 142 F.3d 138, 143 (3d Cir. 1998) (citing 42 U.S.C. § 12102(2) and 29 C.F.R. § 1630.2(g)). Wright concedes that he is not actually disabled, and instead brings a "regarded as" claim under the ADA. Wright Mem. at 6.

To sustain a "regarded as" claim, a plaintiff must establish that the defendant employer had an erroneous perception that the plaintiff is disabled and took an adverse employment action based on that perception. The EEOC regulations interpreting the ADA provide that "regarded as having such an impairment" means that an individual

> (1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such

limitation;

(2) [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) [h]as none of the impairments defined in paragraph (h)(1) or (2)[3] of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l). "An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." Sutton v. United Air Lines, Inc., 527 U.S. 471, 490 (1999).

An employer regards an employee's condition as substantially limiting a major life activity when that employer believes the employee to be "significantly restricted as to the

---

[3] 29 C.F.R. § 1630.2(h) defines "[p]hysical or mental impairment" as

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). A "regarded as" plaintiff does not need to show any invidious motive or animus: "even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Deane, 142 F.3d at 144. But at the same time, "an employer...is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." Sutton, 527 U.S. at 490-91 (emphasis in original).

When determining whether an employer has violated the ADA by regarding an employee as disabled, we start by asking two sets of questions. We first ask "whether the employer's decision to terminate...the employee was motivated by a mistaken belief that the condition precludes him from engaging in some activity...". We then ask whether "the employer thought that [the condition] substantially limited a life activity that is major[, e.g.] the employer thinks that anyone who can't lift 150

10

pounds is incapable of <u>any</u> type of gainful employment." <u>Equal Employment Opportunity Comm'n v. Schneider Nat'l, Inc.</u>, 481 F.3d 507, 509 (7th Cir. 2007) (Posner, J.) (emphasis in original).

Working is a major life activity. <u>Deane</u>, 142 F.3d at 144 (citing 29 C.F.R. § 1630.2(I)). But for an employer to regard an employee as substantially limited in his or her ability to work, the employer must believe that the employee is "significantly restricted" from performing "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." <u>Id.</u> For Wright's "regarded as" claim to survive FLS's motion for summary judgment, he must produce some evidence that would establish that FLS believed his high blood pressure substantially limited his ability to work as a driver.[4]

---

[4] Wright asserts that FLS also regarded him as substantially limited in his ability to pump and circulate blood. Wright Mem. at 5. But Wright does not attempt to produce, or point to any evidence in the record, that would suggest that FLS held such a belief. Wright does not contend that FLS held this belief at any great length: he provides but a single, conclusory sentence in his brief. At this late stage of the litigation, there must be some basis for the arguments in the record. <u>Trap Rock Indus.,</u>

11

Before we can consider the merits of whether FLS's policy had a disparate impact on individuals the ADA protects, we must determine whether the ADA protects Wright. The policy alone cannot establish this. FLS's policy may be inconsistent with the ADA because it causes a disparate impact on those with high blood pressure, but it is not evidence that FLS believed <u>Wright</u> was unable to drive for as long as one in the general population. All the policy evinces is that FLS believed Wright could not drive for the firm.

Nothing about the presented rationales underlying this policy establishes that FLS held "a mistaken belief that the condition preclude[d Wright] from engaging in some activity." <u>Schneider</u>, 481 F.3d at 509. Wright contends that because FLS required all its full-time employees have two-year medical certifications, and Wright could not get such a certification, "[FLS regarded Wright] as substantially limited in his ability to work for long periods of time," <u>i.e.</u>, it would follow that Wright could not drive for as long as an average person in the

---

<u>Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982). No such basis exists for the assertion that FLS believed Wright to be substantially limited in his ability to pump and circulate blood.

population. Wright Mem. at 4. But Wright misconstrues the stated -- and undisputed -- rationale for this policy. FLS hoped that the two-year medical certification would enable FLS to maintain longer tenures for their drivers and better satisfy their customers, who would be assured that drivers would not be removed for medical reasons in less than two years on that job. Joint Stip. ¶ 10; Roman Dep. at 33. That FLS wanted to offer clients long-term drivers with the longest medical certifications does <u>not</u> imply that FLS believed that those drivers without such certifications could not drive for as long as those with the two-year certifications.

Wright presents no evidence that FLS did anything other than follow a bright-line driver qualification policy. The conversations FLS's HR manager, Jeff Muntz, had with Dr. Atri did not involve the specifics of Wright's condition, but focused on whether Wright was properly issued a two-year medical certification in compliance with DOT regulations. Joint Stip. ¶¶ 25-26. It would be a different matter if their conversations had been about whether Wright was able to perform the tasks of a driver given his condition. If Wright's physical ability were discussed, it would indeed infer that FLS might have a mistaken belief about his ability to drive. But that is not what the

13

conversation was about. No such inference is therefore warranted.

Even if Wright could show that FLS mistakenly believed he could not drive for as long as an average person could, Wright still could not establish that FLS "thought that [his high blood pressure] substantially limited a life activity that is major." Schneider, 481 F.3d at 509. To show this, Wright must present some evidence that FLS believed that Wright's condition meant that he could not participate in a broad class of jobs, such as driving trucks. FLS denies that it believed this, and presents as proof its offer to Wright of a job as a FlexDriver. Joint Stip. Ex. P. As a FlexDriver, Wright would have done exactly what he had been doing as a full-time driver except without the attendant benefits of full-time employment, e.g., health insurance, pension benefits. Joint Stip. ¶¶ 2, 3, 13.

Wright contends that this position is not comparable to that of a full-time driver because it does not have the same benefits or consistency of work. Wright Resp. at 3. But the actual work that Wright would perform as a FlexDriver is precisely the same as what he did as a full-time driver: driving trucks for FLS's clients. Though a FlexDriver would not get as many hours as a full-time FLS employee, the job does fall within

the same broad class of jobs that included his work as a full-time FLS driver. Wright presents no evidence that FLS believed his condition as "impair[ing] any 'life activity' other than driving a truck for [FLS full-time]." Schneider, 481 F.3d at 511. The eligibility to work as a full-time FLS driver "is too esoteric a capability to be judged a 'major' life activity." Id. Therefore, Wright cannot carry his burden to establish that FLS believed that he was substantially limited in the major life activity of working as a driver.[5]

---

[5] Wright belongs to a class of plaintiffs who cannot recover under the ADA because of the Supreme Court's holding in Sutton, which limited recovery under the ADA for "regarded as" claims to those plaintiffs whose employers perceived their impairment as limiting a major life activity. Plaintiffs whose employers believed they had impairments -- whether real or not -- but did not believe that the impairment limited a major life activity, were not eligible to recover under the ADA.
Congress recently amended the ADA to undo the effect of Sutton. See Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C § 12101, et seq., and 29 U.S.C. § 705 (2008)). These amendments changed the statute to define "being regarded as having such an impairment" to include "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (2009). Unfortunately for Wright, these amendments did not become effective until January 1, 2009, and Wright does not argue that they should apply retroactively.
Had these amendments applied to Wright's claim, we would have attempted to resolve the question of whether FLS's policy has a disparate impact on a protected group the ADA covers. But because these amendments do not apply, we do not reach that question.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN WRIGHT                    :    CIVIL ACTION
                               :
      v.                       :
                               :
FUNDAMENTAL LABOR STRATEGIES   :    No. 08-1647

ORDER

AND NOW, this 10th day of March, 2009, upon consideration of plaintiff Alan Wright's motion for summary judgment (docket entry #17), defendant Fundamental Labor Strategies motion for summary judgment (docket entry #18), their respective responses, and defendant's reply, it is hereby ORDERED that:

    1.  Plaintiff's breach of contract claim is DISMISSED;

    2.  Defendant's motion for summary judgment is GRANTED;

    3.  Plaintiff's motion for summary judgment is DENIED; and

    4.  The Clerk of Court shall CLOSE this case statistically.

BY THE COURT:

Stewart Dalzell, J.